UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

SECURITIES AND EXCHANGE COMMISSION, )
100 F Street, NE )
Washington, D.C. 20549 )
        Plaintiff, )
        vs. )   COMPLAINT
GLOBALSANTAFE CORP. )
(c/k/a Transocean Worldwide Inc.) )
P.O. Box 10342 )
70 Harbour Drive, 4th Floor )
Grand Cayman, KY1-1003 )
Cayman Islands )
        Defendant. )

---

Plaintiff, U.S. Securities and Exchange Commission (the "Commission"), alleges that:

## SUMMARY

1. From approximately January 2002 through July 2007, GlobalSantaFe Corp. ("GSF") violated the anti-bribery, books and records, and internal controls provisions of the Foreign Corrupt Practices Act (the "FCPA") when GSF made illegal payments through customs brokers to officials of the Nigerian Customs Service ("NCS") in order to obtain preferential treatment during the customs process for the purpose of assisting GSF in retaining business in Nigeria.

2. Instead of moving its oil drilling rigs out of Nigerian waters when GSF's permit to temporarily import the rigs into Nigeria had expired, GSF, through its customs

brokers, made payments to NCS officials in order to obtain documentation reflecting that the rigs had moved out of Nigerian waters, when in fact, the rigs had not moved at all.

3. GSF, through its customs brokers, made other payments, such as, so called "interventions," to Nigerian customs officials in order to obtain preferential treatment during the customs process.

4. In addition, GSF, through its customs brokers, made payments to government officials in Gabon, Angola, and Equatorial Guinea in order to obtain preferential treatment during the customs process. These payments were described on invoices as, for example, "customs vacation," "customs escort," "costs extra police to obtain visa," "official dues," and "authorities fees."

5. By making the payments described in paragraphs two through four above, GSF profited in the amount of approximately $2.7 million by avoiding customs-related costs, including those associated with actually physically moving the rig out of Nigerian waters, and gaining revenues from not interrupting its drilling operations during a move.

6. None of the payments was accurately reflected in GSF's books and records, nor was GSF's system of internal accounting controls adequate at the time to detect and prevent these payments.

7. As a result of this conduct, GSF violated Sections 30A, 13(b)(2)(A) and 13(b)(2)(B) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78dd-1, 78m(b)(2)(A) and 78m(b)(2)(B)] and the Commission seeks permanent injunctive relief, disgorgement of gains wrongfully obtained and a civil penalty.

## JURISDICTION

8. This court has jurisdiction over this action under Sections 21(d), 21(e),

and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa]. GSF, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

9. Venue is appropriate in this Court pursuant to Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

## **DEFENDANT**

10. **GlobalSanteFe Corp.**, during the relevant period, was incorporated in the Cayman Islands and had its headquarters in Texas. GSF provided offshore oil and gas drilling services for oil and gas exploration companies. GSF, acting through its direct subsidiary Global Offshore Drilling Ltd., engaged in the activity in West Africa described herein. GSF's securities were registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on the New York Stock Exchange.

11. On November 27, 2007, GSF completed a merger with a subsidiary of Transocean Inc. and became known as Transocean Worldwide, Inc., which is a subsidiary of Transocean Ltd., the securities of which are registered with the Commission.

## **FACTS**

### I.   The Temporary Importation Permit Process in Nigeria

12. During the relevant period, in order to import offshore drilling equipment, including rigs, into Nigeria on a temporary basis, oil and gas services companies were required to obtain a temporary importation permit ("TIP") from the Nigerian government through NCS.

13. In addition to completing a series of paperwork to obtain a TIP, GSF was

required to register and maintain a bond with a Nigerian bank in the amount of the value of the rig and equipment being temporarily imported.

14. TIPs were initially issued for one year and were allowed to be extended twice for a period of six months each. In addition, rarely, and only in the discretion of NCS officials, a third six-month extension could be granted.

15. Prior to or after the expiration of all permissible TIP extensions, GSF was required to move its rigs out of Nigerian waters and recommence the TIP application process. GSF would have to cancel or let lapse the existing TIP and bond, and apply for a new initial TIP and then re-register a bond with a bank for the issuance of a new one-year TIP.

16. Failing to export a rig after the expiration of a TIP and all permissible extensions rendered the rig subject to potential forfeiture or seizure.

17. To physically export its rigs out of Nigerian waters, GSF, among other things, needed to hire one or more tug boats. Each rig move cost several hundred thousand dollars.

18. To avoid both the cost of exporting the rigs from Nigerian waters and the decreased revenues associated with moving its rigs out of Nigeria, GSF paid bribes, through its customs broker, to officials of NCS in order to obtain false paperwork which reflected that GSF's rig had moved out of and back into Nigerian waters, when, in fact, the rig never left Nigerian waters.

19. From approximately January 2002 through July 2007, GSF engaged in at least 4 of these "paper moves."[1]

---

[1] A single paper move is counted as one paper export and subsequent paper import as opposed to counting separately each paper export and subsequent paper import.

4

## II. The Adriatic VIII's Two Paper Moves

20. The Adriatic VIII, a 328 foot jack-up rig, was a GSF rig performing drilling work in Nigeria for various oil company clients during the 2002 through 2007 time period.

21. GSF obtained its initial twelve-month TIP from NCS for the Adriatic VIII on October 17, 2002 and two additional six-month TIP extensions valid from October 16, 2003, and April 16, 2004, respectively.

22. Accordingly, pursuant to its second TIP extension granted on April 16, 2004, GSF was authorized by NCS to maintain the Adriatic VIII in Nigerian waters until October 15, 2004. GSF did not obtain a third discretionary extension, and thus, on or before October 15, 2004, the rig should have left Nigerian waters until NCS approved the issuance of a new one-year TIP.

23. However, the Adriatic VIII did not leave Nigerian waters on October 15, 2004. Instead, beginning in late September 2004, GSF, through its customs broker, took steps to obtain false documentation from NCS. The documentation bore an NCS insignia, official stamps, and other signatures of NCS officials, including a "release for outward clearance," reflecting that the Adriatic VIII left Nigeria on September 29, 2004.

24. GSF, through its customs broker, obtained this documentation by making payments to officials of NCS. GSF paid its customs broker $87,500 to obtain the new TIP, including a payment of $3,500 identified on the customs broker's invoice as "additional charges for *export*" (emphasis added).

25. Payment was made to GSF's customs broker by wire transfer from a bank account in the name of GSF located in the United States.

26.     GSF managers in Nigeria, acting on behalf of GSF, knew that the Adriatic VIII had never actually left Nigerian waters and knew, or knew that there was a high probability, that the explanation on the invoice as "additional charges for export" was for the purposes of disguising a bribe.

27.     A few years later, in May 2007, GSF, through its customs broker, again obtained false documentation from NCS reflecting that the Adriatic VIII had left Nigerian waters when, in fact, it had not. GSF ultimately did not authorize reimbursement to its customs broker for the payments to customs officials for this documentation.

### III.   The Adriatic I and Baltic I Paper Moves

28.     In March 2004, GSF, through its customs broker, again paid NCS officials in order to obtain false documentation for a paper move for GSF's Adriatic I rig.

29.     More specifically, on January 14, 2002, GSF obtained its initial twelve-month TIP from NCS for the Adriatic I and two additional six-month TIP extensions on January 31, 2003, and August 1, 2003, respectively.

30.     Accordingly, pursuant to its second TIP extension granted on August 1, 2003, GSF was authorized by NCS to maintain the Adriatic I in Nigerian waters until January 31, 2004. GSF did not obtain a third discretionary extension, and thus, on or before January 31, 2004, its rig should have left Nigerian waters until NCS approved the issuance of a new one-year TIP.

31.     However, the Adriatic I did not leave Nigerian waters on or before January 31, 2004. Instead, GSF, through its customs broker, obtained documentation from NCS, reflecting that the Adriatic I left Nigeria on January 31, 2004 when, in fact, it had not.

6

32. In July 2004, GSF, through its customs broker, again paid NCS officials in order to obtain false documentation for a paper move for GSF's Baltic I rig.

33. More specifically, on June 4, 2002, GSF obtained its initial twelve-month TIP from NCS for the Baltic I and two additional six-month TIP extensions on June 4, 2003, and December 4, 2003, respectively.

34. Accordingly, pursuant to its second TIP extension granted on December 4, 2003, GSF was authorized by NCS to maintain the Baltic I in Nigerian waters until June 3, 2004. GSF did not obtain a third discretionary extension, and thus, on or before June 3, 2004, its rig should have left Nigerian waters until NCS approved the issuance of a new one-year TIP.

35. However, the Baltic I did not leave Nigerian waters on June 3, 2004. Instead, in June 2004, GSF, through its customs broker, took steps to obtain documentation from NCS, reflecting that the Baltic I left Nigeria on June 25, 2004.

36. The GSF managers, acting on behalf of GSF, authorized and submitted for payment invoices containing charges described as "additional charges for export" when the same GSF managers knew that the GSF rig had not been exported from Nigeria. Thus, the GSF managers either knew that the "additional charges for export" were bribes, or knew that there was a high probability that they were bribes.

37. The payments by GSF through its customs brokers to Nigerian customs officials for documentation relating to paper moves were made from bank accounts in the United States.

38. By engaging in the above-referenced paper moves, GSF (1) avoided costs of approximately $1.5 million from not physically moving the rigs; and (2) gained revenues of approximately $619,000 from not interrupting operations to move the rigs.

39. None of the payments relating to the paper moves discussed above was accurately reflected in GSF's books and records.

40. By making the payments to Nigerian customs officials through its customs brokers in connection with the paper moves described above, GSF violated the anti-bribery provisions of the FCPA.

### IV. Other Suspicious Payments in Nigeria

41. During the relevant period, GSF, through its customs brokers, made a number of additional payments to government officials in Nigeria totaling approximately $82,000. Among these payments were the following:

- A $45,000 payment in October 2004, identified on its customs broker's invoice as an "intervention on consumables" for GSF's Adriatic VI rig.

- A $15,000 payment in May 2004, identified on its customs broker's invoice as an "intervention" for GSF's Adriatic VI rig.

- An approximately $13,000 payment in April 2002 to obtain fraudulent paperwork from NCS officials for a backdated TIP extension for GSF's Adriatic V.

- A $4,734 payment in June 2002 for the purpose of "retaining" i.e. keeping open a TIP on GSF's Adriatic I rig for the time when the rig left Nigeria and returned in June 2002.

42. None of these payments was accurately reflected in GSF's books and records.

43. By making the above-referenced payments, GSF avoided costs and gained revenues of approximately $268,000.

V. **Other Suspicious Payments in Angola, Gabon, and Equatorial Guinea**

44. GSF, through its customs brokers, also made a number of other payments during the relevant period totaling approximately $300,000 to government officials in Gabon, Angola, and Equatorial Guinea.

45. Among these payments were the following:

- An approximately $12,400 payment in Angola for "official dues."
- A $5,497 payment in Angola for "authorities fees."
- 13 payments for "customs escort" in Gabon totaling approximately $1,600.
- 550 payments for "customs pre-clearance" in Equatorial Guinea totaling approximately $130,000.

46. None of the above-referenced illegal payments in Nigeria, Angola, Gabon, and Equatorial Guinea were accurately reflected in GSF's books and records. Instead, the payments were recorded as legitimate transaction costs such as "additional charges for export," "intervention," or "authorities fees," and thus were not fairly reflected or accurately recorded in its books, records, and accounts.

47. Further, GSF failed to devise and maintain an effective system of internal controls to prevent or detect the above-referenced improper payments. GSF paid invoices that contained inadequate documentation to justify the charges. In addition,

GSF paid invoices containing descriptions of charges that should have raised red flags and prompted further inquiry. For example, GSF paid, without further inquiry, invoices with descriptions such as: "intervention," "customs formalities," "customs escort," "customs fine," "customs overtime," and "customs vacation." This lack of effective internal controls facilitated the improper payments described herein.

## FIRST CLAIM FOR RELIEF

### GSF Violated Section 30A of the Exchange Act
### (Anti-Bribery Provisions of the Foreign Corrupt Practices Act)

48. Paragraphs 1 through 47 are realleged and incorporated herein by reference.

49. As described above in paragraphs 12 through 40 regarding the paper moves, GSF, a U.S. issuer, made use of the mails or other means or instrumentality of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, or authorization of the payment of any money, or offer, gift, promise to give, or authorization of the giving of anything of value, to foreign officials for the purposes of influencing their acts or decisions, securing an improper advantage, or inducing them to use their influence, to assist the issuer in obtaining or retaining business.

50. By reason of the foregoing, GSF violated, and unless restrained and enjoined, may continue to violate Section 30A of the Exchange Act [15 U.S.C. § 78dd-1].

## SECOND CLAIM FOR RELIEF

### GSF Violated Sections 13(b)(2)(A) & 13(b)(2)(B) of the Exchange Act
(Company Records and Internal Controls)

51. Paragraphs 1 through 47 above are realleged and incorporated by reference herein.

52. Section 13(b)(2)(A) of the Exchange Act requires companies to keep accurate books, records and accounts which reflect fairly the transactions entered into by the company and the disposition of its assets.

53. Section 13(b)(2)(B) requires companies to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and to maintain accountability for such assets.

54. By reason of the foregoing, GSF violated Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A) & (B)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

(1) Enter a final judgment permanently enjoining GSF from violating Sections 30A, 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78dd-1 and 78m(b)(2)(A) & (B)];

(2) Enter a final judgment ordering GSF to disgorge gains wrongfully obtained as a result of its conduct;

(3) Order GSF to pay civil penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

(4) Grant the Commission such other and further relief as is just and appropriate.

Dated: November 4, 2010

        Respectfully Submitted,

        */s/ Laura B. Josephs*

        Laura B. Josephs (D.C. Bar No. 414519)
        Linda Berrafati Moran (D.C. Bar No. 445759)
        Amy L. Friedman (D.C. Bar No. 473985)
        Matthew W. Hefferan (D.C. Bar No. 494716)

        Attorneys for Plaintiff
        Securities and Exchange Commission
        100 F Street, N.E.
        Washington, DC 20549-5010A
        Tel: (202) 551-4968 (Josephs)
        Fax: (202) 772-9231